UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

                                                Case No. 24-cr-90 (WED)

v.

ERIC E. LENZEN,

      Defendant.

## SENTENCING MEMORANDUM

The defendant, Eric E. Lenzen, was a high-powered, highly compensated attorney leading the financial services and capital markets group at Husch Blackwell, an AmLaw 100 firm. Despite his education, experience, and financial means, defendant made a choice not to pay his taxes. Defendant was given years to remedy that choice through the administrative process, during which time he communicated with a Revenue Officer (R.O.) at the IRS many, many times. But defendant never did pay what he owed. Instead, throughout the period spanning September 2018 and February 2021, defendant made a multitude of false representations, and took significant actions, to avoid paying his taxes. While avoiding paying his fair share, the defendant simultaneously spent nearly $1.5 million on a lavish lifestyle that included private planes, jewelry, and golf club

memberships. (PSR ¶ 24). This is in addition to hundreds of thousands of dollars that he moved or transferred to third parties. (*See e.g.*, PSR ¶ 18).

Defendant's failure to pay his taxes was not a one-time poor decision nor a single mistake. This crime is the result of an extended course of conduct during which defendant repeatedly lied to IRS employees and moved and transferred money so that he could avoid paying taxes while continuing to enjoy living extravagantly. The nature of defendant's conduct here warrants a significant custodial sentence to vindicate the purposes of Section 3553(a), which include ensuring just punishment, promoting respect for the law, and ensuring adequate deterrence.

As such, the United States recommends that this Court impose a sentence of 8 months on each count, to run consecutive to one another, for a total term of 16 months' imprisonment.

## I. The Familiar Standard

When imposing sentence, this Court must consider the factors set forth in 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

2

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

The court should conduct a fulsome inquiry "largely unlimited" in scope and source to determine the appropriate sentence. *See United States v. Tucker*, 404 U.S. 443, 446-47 (1972). Indeed, 18 U.S.C. § 3661 provides that:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

These statutes reflect a clear Congressional directive: district courts should engage in a broad and holistic review of the defendant's conduct and character when imposing sentence.

## II.     The Appropriate Sentence: 16 Months' Imprisonment

Each of the Section 3553(a) factors counsels in favor of a substantial imprisonment term for this defendant.

### A. *Nature and Circumstances of the Offense*

Although the offense at issue is a misdemeanor, the nature and circumstances of defendant's crime make it a serious one. This is true, in part, because of the excessive amount of taxes that Defendant willfully failed to pay to the IRS – nearly $2.5 million. (PSR ¶¶ 7, 25). Even that staggering sum is artificially low given that it represents only

3

the taxes that Defendant owed and did not pay, and not any of the penalties or interest that accrued on the amount. *Id.*

Of course, the numbers alone do not tell the whole story here. Instead, defendant's years' long interactions with the IRS revenue officers demonstrates just how committed defendant was to avoiding paying his fair share. Between 2018 and 2021, defendant had numerous interactions with various revenue officers. During those interactions, defendant acknowledged he owed money to the IRS and made purported plans to pay it. Defendant's promises were exceedingly successful in putting off the revenue officers who understandably believed that a well-educated, reputable attorney like defendant would stay true to his word. But those officers' assessments were wrong; defendant never followed through.

Indeed, defendant's statements and proposed plans were almost universally false. Defendant objects to the characterization of his statements as lies and characterizes them instead as "expressions of promises he hoped to be able to fulfill." (PSR Addendum, p. 1). But that euphemism simply does not capture the outright falsehoods defendant told. Nor does it account for the clear pattern of defendant's behavior which, when looked upon as a whole, leads overwhelmingly to one conclusion: defendant engaged in a pattern of conduct that was meant to (and did) string along the R.O.s in such a way as to allow defendant to avoid paying the IRS so that he could instead spend his money on an extravagantly lavish lifestyle.

Just a few examples demonstrate the point. For example, on November 30, 2018, two months after his first interactions with the R.O., defendant called the R.O. and told

4

him that a payment of $25,000 would be sent and that he was on track to pay the remainder. (PSR ¶ 9). No payment was sent, and defendant did not pay the remainder of what he owed. *Id.* On December 14, 2018, defendant said he would make payment in full by the 31st. (PSR ¶ 10). He didn't. This was not a one-off incident; the pattern continued consistently.

In another example, on February 20, 2019, defendant told the R.O. he would pay the remainder of his debt by April 1, 2019. (PSR ¶ 13). A review of bank records show that defendant had money to pay some taxes, but instead of using that money to fulfill his promise, defendant made transfers totaling over $1.4 million to various third parties during the month of March 2019. Shortly thereafter, defendant gave the R.O. a bounced check. (PSR ¶ 14).

A similar thing happened in 2020. Defendant told the R.O. that he planned to liquidate investments to pay the amounts owed. (PSR ¶ 17). On January 8, 2021, he told the R.O. that he was sending a payment that day. (PSR ¶ 18). He didn't. It is hard to square this scenario with defendant's position that his promises were expressions of hope or that he had a good faith belief he would send a payment. That position is made even more dubious by the fact that just a few days later, the defendant told the R.O. that a $250,000 *had been sent*. *Id.* That was untrue. *Id.* What was true, however, was that on that *same day*, defendant took out $185,000 from his bank accounts in the form of cashier's checks. *Id.* One of those, made out to defendant himself, was later deposited back into his account. *Id.* This effort to move money out of his accounts was also not a one-time event. Another occurred in May 2021 when, just one day after the IRS levied defendant's

5

Landmark Credit Union Account, defendant closed that account, opened a new one at U.S. Bank, and changed his direct deposit to the new account. (PSR ¶ 22). It is hard to argue that this was merely a coincidence or that someone with defendant's expertise, sophistication, and education did not know that these actions would hamper the IRS's ability to collect the debt.

Ultimately, it is hard to square the defendant's pattern of conduct with his explanation of his offense or his characterization that this was a situation in which defendant had a legitimate "hope" of being able to make a payment and later realized "he was not in a position to fulfill" that hope. (PSR Addendum, p. 1). Indeed, the clear pattern of defendant's conduct over the years belies any notion that defendant's failure to pay his taxes was the result of a mistake or a series of foolish, but good faith, expressions of hope. Instead, the sheer number of times that defendant said one thing to the R.O.s while simultaneously transferring hundreds of thousands of dollars between accounts or to third parties shows how volitional and intentional his conduct was. That behavior is a significant factor supporting the government's request for a 16-month sentence here.

Bolstering the need for a significant custodial sentence is the fact that defendant's crimes were motivated by greed, not need. Indeed, during the relevant period, defendant had plenty of money to pay what he owed. Defendant's statement of acceptance curiously argues otherwise. (PSR ¶ 30). But defendant's assertion that he *couldn't* (rather than wouldn't) pay is wholly refuted by the income he was making as a partner at an AmLaw 100 firm *and* his access to other money (he and his wife over $2.1 million from family in

2019 alone). (PSR ¶¶ 6, 15). It is also further refuted by his excessively lavish spending. Indeed, during the time he owed the IRS taxes, he bankrolled an extravagant lifestyle that included over $200,000 on private planes, over $100,000 on jewelry, over $200,000 on a home remodel and appliances, and over $500,000 at golf clubs. (PSR ¶ 24). These expenditures are not payments of other debts or efforts to support his family; they are extravagant, and discretionary.

At bottom, to fund his own lavish lifestyle, the defendant effectively stole millions from the government and, by extension, the public. His failure to pay his fair share had nothing to do with his *ability*, and everything to do with his *choices*.

These circumstances make defendant's conduct a serious version of the misdemeanor crime with which he is charged. As such, a significant custodial sentence is required to provide just punishment here.

### B. History and Characteristics of the Defendant

The defendant knew better. He is a lawyer by training and education, and a CPA. He also grew up with every advantage. He had a "stable" upbringing, and loving parents and stepparents. (PSR ¶ 59-63). He also had supportive grandparents, was involved in church, and had a stable group of friends with whom he still maintains contact. (PSR ¶ 65). The defendant also benefited from amazing educational opportunities and had a long and stable marriage. (PSR ¶ 66-67). He was also able to achieve tremendous success as an attorney at two prominent law firms and was profiled by the Business Journal in 2016.[1]

---

[1] https://www.bizjournals.com/milwaukee/news/2016/11/24/young-gun-raises-his-profile-at-husch-blackwell.html

7

In some ways, these are mitigating factors – they demonstrate that the defendant has the family support and background to be a law-abiding member of society.

In many ways, however, defendant's history and characteristics make his conduct more aggravated. The PSR and defendant's history depict a man with every ability, and incentive, to engage in law-abiding behavior. Moreover, someone with as many gifts and advantages as the defendant should affirmatively want to contribute to his community through the simple law-abiding behavior of paying taxes owed. But the defendant didn't engage in law-abiding behavior. Instead, he took advantage of his education, his law degree, and his status as a CPA to avoid the very basic requirements of citizenship.

And he did so even though he did not need the money. The defendant spent years in prominent positions at national law firms with sterling reputations. His reported income sometimes exceeded even $2 million per year. (PSR ¶ 6). Indeed, he made multiple millions during the relevant period. In short, he had the money to pay, knew what he owed, and made a choice to avoid paying it. That speaks significantly to his character.

Moreover, defendant's willful failure to pay taxes, and his attendant lies to the IRS, were not the only material misrepresentations he made during this period. Indeed, during the same time that he was avoiding paying his taxes, while simultaneously acknowledging he owed them, the defendant applied for a $750,000 loan in which he lied about having zero tax liability. (PSR ¶ 11, 26). The defendant knew that the application would be used to assess his ability to pay on the loan, and that the information requested was material, and he attested that the information he provided was true. *Id.* It was not.

8

Defendant *knew*, when he signed that paperwork, that he owed the IRS nearly $500,000. *Id.* Perhaps unsurprisingly, the defendant defaulted on the loan, and the bank had to initiate litigation to recover the money. (PSR Addendum). This material misrepresentation in an effort to obtain money speaks quite poorly of the defendant's character and respect for the law.

Even more incredibly, evidence of how those close to him view him and information about his past conduct, paints an even more damning picture. For example, the defendant's father felt strongly enough about his financial dealings with the defendant that he filed a letter with this Court making serious accusations about forgery and fraud. (ECF No. 10.). The government attempted to investigate these allegations, but Dr. Lenzen was ultimately not interested in involving himself in his son's legal issues beyond providing the Court his letter. As such, the government can neither confirm nor deny the veracity of those allegations. Nonetheless, the mere fact that defendant's own father believes that his son engaged in the kind of fraud described in that letter, pursued a judgment against in court, and thought it necessary for the Court to have this history in sentencing him, is relevant to this Court's examination of defendant's characteristics.

Moreover, Dr. Lenzen's accusations are not an anomaly. Indeed, in January 2018, other family members hired an attorney to resolve allegations that the defendant engaged in "improper and imprudent investment activities…as a fiduciary" and also engaged in "self-dealing" when he served as a trustee for a family trust. (Exh. 1)[2]. Then, in March

---

[2] Because these letters identify unrelated, innocent third parties, the government has separately moved this court for permission to file these documents under seal.

2018, the same law firm sent defendant another communication in which the lawyers explained that they had analyzed the trust's bank records and uncovered a total of "25 thefts, totaling $78,549.04" from the account over which the defendant served as a fiduciary. (Exh. 2). The defendant ultimately resolved these allegations with an agreement to pay for the investments he made, and to compensate the trust with an additional $82,050. (Exh. 3). Dr. Richard Lenzen, apparently agreed to guarantee the payments in that agreement. (Exh. 4). Because the statute of limitations on any fraud alleged in these letters has passed and because they do not bear on substantive allegations of the crimes with which the defendant is charged, the United States did not independently confirm the allegations in these exhibits. As such, the United States does not ask this Court to take the allegations as true. But the fact that these allegations were made, and the level of specificity detailed in these letters, make them relevant to this court's analysis of the defendant's history and characteristics, particularly in light of other information available about the defendant.

At bottom, defendant's lies on a bank application, and two separate allegations that defendant committed fraud and violated fiduciary duties, provide the court with meaningful information about the defendant's character and his lack of respect for the law. Moreover, this information certainly belies any argument his counsel might make that his failure to pay taxes here was an uncharacteristic lapse in judgment.

Viewed in their totality, therefore, and considering that defendant's status as a CPA and an attorney placed a higher burden on him to act within the bounds of ethics

and law, the defendant's history and characteristics support a significant custodial sentence here.

## C. The Advisory Guidelines Range

Although the Sentencing Guidelines are no longer mandatory, they remain the "lodestar" of federal sentencing, "inform[ing] and instruct[ing] the district court's determination of an appropriate sentence." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).

The parties and the probation officer agree that the adjusted offense level is 19, with a criminal history category of I, yielding a guideline imprisonment range of 30-37 months. (PSR ¶ 98). That range, however, is higher than the statutorily authorized maximum for the two charged offenses, which makes the guideline term of imprisonment 24 months. *Id.*

The government's recommendation here represents a significant downward departure from that adjusted guideline range. That downward departure is based on the totality of the circumstances, the fact that the crimes at issue are misdemeanors, and the defendant's very early plea and acceptance of responsibility. The government believes that a sentence of 16 months is sufficient, but not greater than necessary to vindicate the goals of sentencing.

## D. The Public's Interest and Deterrence

The official victim in this case is the IRS, but the true victims are the law-abiding, tax-paying public. The country's taxpayers suffer significantly when fraudsters don't pay

11

taxes. Indeed, the Sentencing Guidelines themselves explain the importance of the criminal tax laws in protecting the public interest:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

USSG 2T1.1, introductory comment

In this case, Defendant effectively stole over $2 million from the public coffers, and he used the money that he didn't pay into the system to pay for his private plane travel, golf clubs, jewelry, and other lavish items. It is critical to send the public a message that brazen efforts not to pay what you owe do not go unpunished, particularly when the defendant is well-educated, wealthy, and a lawyer who certainly knows better. That is why courts in this district have often recognized that the concept of "general deterrence may be more of a factor in white collar cases, where at least some of the people tempted to commit such crimes are rational actors who would be dissuaded by the prospect of prison." *United States v. Goss*, 325 F. Supp. 3d 932, 935 (E.D. Wis. 2018). The Seventh Circuit has also "endorsed the idea that white-collar criminals 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)).

These principles have been reaffirmed by other circuits as well. *See e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity these crimes are 'prime candidate[s] for general deterrence." (cleaned up)); *United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013) (referencing the need to implement a meaningful custodial sentence in white collar cases, even when "it was undisputed at the time of sentencing that [a defendant's] past history was exemplary.").

These concepts matter here. The public should know that willfully failing to pay taxes can expose individuals to significant consequences. *Warner*, 792 F.3d at 861 ("effective deterrence of tax crimes requires a credible threat of imprisonment.")

### III. Conclusion

Defendant's crimes were serious in that he willfully failed to pay millions of dollars in taxes while simultaneously engaging in profligate personal spending and undertaking significant efforts to make it more difficult for the IRS to recover the money he owed. That said, the defendant did take early responsibility for his conduct and pleaded guilty prior to indictment. That speaks in his favor, as do some of the facts about his history and characteristics, which demonstrate that he has the ability to serve as a law-abiding member of the public after any sentence he serves.

Based on the totality of the information above, particularly the circumstances of his offense, his characteristics and history, the need to promote respect for the law, and the need to ensure adequate deterrence, the United States respectfully requests that this

13

Court sentence the defendant to a total of 8 months' imprisonment on each count, to run consecutively, for a total of 16 months' imprisonment.

Respectfully submitted this 8th day of October, 2024, at Milwaukee, Wisconsin.

                GREGORY J. HAANSTAD
                United States Attorney

By:   /s/ *Julie F. Stewart*

                JULIE F. STEWART

                Assistant United States Attorneys
                United States Attorney's Office